IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SARA ELLIOTT,                          :        C.A. 10-844-RGA
                                       :
            Plaintiff,                 :
                                       :
    v.                                 :
                                       :
DELAWARE STATE UNIVERSITY,             :
                                       :
            Defendant.                 :
                                       :
                                       :
                                       :

## MEMORANDUM OPINION

---

Michael G. Rushe, Esq., Dover, Delaware; Mark B. Frost, Esq. (argued), Philadelphia, Pennsylvania; Attorneys for Plaintiff Sara Elliott.

James D. Taylor, Jr., Esq. (argued), Wilmington, Delaware; Jennifer M. Becnel-Guzzo, Esq., Wilmington, Delaware; Attorneys for Defendant Delaware State University.

---

July 25, 2012
Wilmington, Delaware

1

*Richard G. Andrews*

ANDREWS, UNITED STATES DISTRICT JUDGE:

## I. Introduction

Plaintiff Sara Elliott sued Defendant Delaware State University ("DSU") for Title VI

claims of racial discrimination, racially hostile environment, and retaliation. DSU now moves

for summary judgment on these claims. The Court may grant a motion for summary judgment

only "where the pleadings, depositions, answers to interrogatories, admissions, and affidavits

show there is no genuine issue of material fact and that the moving party is entitled to judgment

as a matter of law." *Azur v. Chase Bank, USA, Nat'l Ass'n,* 601 F.3d 212, 216 (3d Cir. 2010).

The Court grants DSU's motion as to the racial discrimination and racially hostile environment

claims, but denies the motion as to the retaliation claim.

## II. Factual Background

Because we are at the summary judgment stage of the proceeding, the facts are viewed in

the light most favorable to Elliott as the non-moving party. On August 7, 2009, Elliott left her

hometown of Torrance, California to attend Delaware State University on a volleyball

scholarship. (D.I. 56, A76, 338). Elliott moved into university housing and shared a suite with

three other athletes and two non-athletes. *Id.* at 338. Soon after, she began having problems

with her non-athlete black suitemate, Kristen Williams. *Id.* at 338-39. On the night of

September 6, Williams brought to the suite three intoxicated men. *Id.* These men made a mess

of the bathroom, pounded on the bedroom doors, and refused to leave when requested. *Id.*

Elliott and two of her suitemates eventually summoned the Residential Advisor ("RA"), who

arrived at the suite and asked the men to leave. *Id.* at 339. When the men refused, the RA left to

summon police. *Id.* One of the men racially abused Elliott and another white suitemate, stating,

2

"If I ever see these white bitches around campus, they're done! I swear to God these stupid white bitches don't know who they're messing with." *Id.* at 339. Williams added, "These white girls know nothing, they probably called again and you all know your attitude, so you better leave for tonight." *Id.* Two days later, Elliott formally complained to Residential Director Christopher Hall. *Id.* at 340. She not only told him about the "racial death threats," but also about Williams' playing of loud music at late hours. *Id.* Hall assured Elliott he would take care of the situation. *Id.* Hall filed an "informational report" that indicated Williams was suspected of "disruptive behavior" and "disorderly conduct," but did not detail any racial abuse violations. *Id.* at 107-08. Hall later told Elliott that his failure to categorize the incident as a more serious "infraction report" was "accidental." *Id.* at 341.

Williams' hostility toward Elliott and the other white suitemates continued in the following weeks. *Id.* at 340. Williams refused to turn down her music during very late hours, despite numerous requests that she do so. *Id.* at 340-41. Late in the evening of September 21, Elliott and some of her suitemates left a sticky note on the bathroom mirror that said, "Quiet hours start at 10 PM. Thank you. ☺" *Id.* at 340. Williams responded with, "Fuck your scholarships, I'm going to make sure you get kicked out for this. Fuck you white girls and if I see you around campus, you're done! Stupid white girls, you stupid white bitches are done. I'm going to kick your white asses." *Id.* at 341. Elliott contacted Hall that night and he arrived around 11:30 p.m. *Id.* Hall held a meeting with the suitemates and attempted to resolve the situation. *Id.* Williams spoke first, telling her side of the story. *Id.* Hall did not allow Elliott to tell her side of the story. *Id.* Instead, Hall admonished Elliott and her suitemates for "pulling the race card." *Id.* Hall then indicated that he was not going to write up a complaint and warned

3

Elliott not to pursue any further complaints, stating, "That would be throwing me under the bus and it will come back." *Id.* at 341.[1]

Despite Hall's request that Elliott not pursue the matter further, Elliott submitted a formal complaint. (D.I. 56, A189-93, 342). Elliott's mother, on September 27, informed Elliott's volleyball coach, Renee Arnold, of the situation by attaching a copy of the complaint to an email to the DSU police and Coach Arnold, requesting a copy of the incident report relating to the September 6 incident. *Id.* Subsequently, on September 28, Hall filed a formal "incident report" that detailed the continued conflict between the suitemates, apparently in response to a phone call by his superior, Paula Duffy. *Id.* at 103-04, 129. In early October, Hall informed Elliott that Elliott would be transferred to another dorm. *Id.* at 342. Elliott's mother protested, saying it was unfair that Elliott be the student required to move. *Id.* Hall changed course and required Williams to vacate the suite. *Id.* at 342-43. Williams was eventually charged with violating the DSU Code of Student Conduct in relation to the September 6 incident, but was acquitted due to a lack of evidence. *Id.* at 113. Elliott was never called as a witness. *Id.* at 7, 48. Elliott testified that she informed DSU officials that she did not want to miss class to attend the hearing. (D.I. 52, A57-58). Elliott's mother also informed Arnold by phone that she and Elliott felt that Elliott was facing retaliation for "reporting these racial death threats," at which time Arnold angrily said that all complaints should be directed toward her. (D.I. 56, A323).[2]

---

[1] Hall's deposition testimony puts a different gloss on this meeting. He testified that Williams said that Elliott called her "nigger." (D.I. 52, A102). He also testified that his comments were directed at all of the suitemates, including Williams. *Id.* He was trying to mediate the dispute in order to avoid triggering University judicial proceedings against any individual student. *Id.* at 70-77. Since we are at the summary judgment stage, the Court accepts the Plaintiff's gloss on the facts when there is a dispute, but also accepts Hall's testimony to the extent it is undisputed.

[2] The date of this phone call is not specified. On October 1, Coach Arnold emailed Elliott's mother, stating:

> I want to apologize for this happening. I wish we still did not live in such ignorant times where racism exists on a campus that is meant to raise your knowledge and awareness of being prepared for the next part

4

Coach Arnold abruptly stopped talking to Elliott at some time in October. *Id.* at 343. Elliott was not allowed to play in any games. (D.I. 56, A343).[3] In December 2009, Elliott scheduled a meeting with Arnold, but the record is unclear as to whether the meeting took place. *Id.* Later, in April 2010, Arnold informed Elliott that her scholarship was not being renewed due to budget cuts. *Id.* at 344. One other player's scholarship was also not to be renewed; this player was black. (D.I. 52, A68, 128). At deposition, Arnold admitted that the volleyball scholarship budget was not actually cut. *Id.* at 13. Arnold then stated that the two women's scholarships were to be terminated because they had poor attitudes, were not coachable, and did not fit into the philosophy of the team. *Id.* She later added that Elliott was not a skillful enough player. *Id.* at 162. Derek Carter, the Director of Athletics at DSU and superior to Arnold, overruled Arnold's decision to not renew Elliott's scholarship. *Id.* at 164-65, 174-75. Elliott's mother had contacted Carter on April 22, 2010, and relayed her concerns that Arnold was lying, discriminating, retaliating, and failing to develop her daughter as a volleyball player. (D.I. 56, A326-28). Carter relayed this complaint to Arnold, telling her that Elliott thought she was a racist and was suing DSU. (D.I. 52, A147).

Coach Arnold soon announced to the entire team, outside of Elliott's presence, that the only reason Elliott was back on the team was because Elliott accused Arnold of being a racist and was going to sue the school. *Id.* at 130-31. In June 2010, Elliott's profile was removed from

---

of life. A mistake was made in bringing someone on campus that was not ready to see the world and what beauty it holds in its people and their culture. Now that I am going to be a mother, I hope that by the time my son goes to college, his mixed race will not be a deterrent but something that is celebrated as I will teach him to celebrate different people and their beliefs. Sara is a great young woman and [I] would love her to remain on our team. She is everything that I hope I can recruit for this University.

(D.I. 56, A204).

[3] Elliott states that Coach Arnold explained that she was being "redshirted," and that Coach Arnold expected that she would eventually be team captain. (D.I. 52, A63).

the team web-site and Elliott was excluded from team text messages. (D.I. 56, A349).  Elliott

faced disproportionate punishment at practice; the entire team would be forced to run when

Elliott made mistakes.  *Id.* at 350-51.  This did not occur when other players made errors.  *Id.*  In

August 2010, Elliott was told she could not travel with the team because of travel expenses;

Coach Arnold's infant son, however, was allowed to travel with the team.  (D.I. 52, A160; D.I.

56, A350).  After Elliott's mother complained to DSU officials, Coach Arnold allowed Elliott to

travel to away games, but informed the team that everyone would therefore receive less money

for food.  *Id.* at 351.  Elliott played in October 2010 for a few minutes in a single game of the

thirty-nine game season.  *Id.*  This was her only playing time before the season ended in

December 2010.  *Id.*

        In February 2011, Elliott and one other volleyball player were summoned for drug

testing.  *Id.* at 352.  The other player was black.  (D.I. 52, A74).  Despite being drug tested for

five hours, Elliott was unable to give an adequate urine sample.  (D.I. 56, A352).  Elliott and the

other player were forced to come back the next day for more testing.  *Id.* at 353.  They were

tested for three and a half hours until they finally gave adequate urine samples, which ended up

testing positive for drugs.  *Id.* at 352-54.  Coach Arnold reported that she ordered the drug testing

because a recruit had told her that Elliott and the other player were doing something illegal,

although the exact illegal act was undetermined.  (D.I. 52, A135-37).  Also in February 2011,

Coach Arnold forced Elliott to practice through painful shin splints and would not excuse her

until she provided medical documentation.  (D.I. 56, A354).  Medical documentation was not

required for other players complaining of injury.  *Id.*  Elliott saw two doctors, was prescribed

naproxen and Vicodin, and underwent x-rays.  *Id.*  On March 1, 2011, while her appeal from the

drug testing results was pending, Elliott's dissatisfaction with her experience at DSU caused her to leave the school. *Id.*

## III.  Discussion

The Complaint alleges the facts in detail. (D.I. 1, ¶¶ 17-47). It alleges its three legal theories in two sentences. (D.I. 1, ¶¶ 49, 52). It incorporates all the factual allegations by reference without any explanation as to which facts accompany which theories. Thus, the Court relies upon Plaintiff's Brief to understand the Plaintiff's argument. (D.I. 55).

### A. Racial Discrimination

DSU moves for summary judgment of Elliott's Title VI discrimination claim. To avoid summary judgment, Elliott must make a prima facie case of discrimination by establishing material facts in support of the following: (1) she was a member of a protected class; (2) she was qualified to continue in pursuit of her education; (3) she was treated differently from similarly situated students who were not members of the protected class; and (4) she suffered an adverse action. *Underwood v. La Salle Univ.*, 2007 WL 4245737, *6 (E.D. Pa. 2007). If Elliott successfully makes this prima facie case, the burden will switch to DSU to put forth a legitimate and nondiscriminatory reason for the adverse action. *Id.* If DSU satisfies this requirement, the burden will switch back to Elliott to prove that DSU's reasons are pretext for discrimination. *Id.*

In regard to the prima facie case of discrimination, there is no dispute that Elliott meets the first two requirements. She was a member of a protected class, and she was a good student. The parties do not agree on much else. Elliott's argument combines the housing incident and the volleyball team experience as though they were one seamless and unified event occurring over a short period of time. (D.I. 55, pp. 17-20). In the housing incident, there are racial issues, but no

7

adverse action. In the volleyball team experience, there are no racial issues, while there may be an adverse action.

Elliott presents a complicated factual theory in support of her discrimination claim. Elliott argues that DSU Residential Director Christopher Hall was racially biased against her and wrongfully favored her black suitemate, Kristen Williams. Specifically, Elliott argues that Hall failed to give her equal time during the suitemate mediation, undermined her complaints of racial abuse, failed to properly categorize reports of Williams' wrongful conduct, threatened her for complaining about Williams, dragged his feet in initiating disciplinary action against Williams, and never called Elliott to make a statement against Williams during the judicial proceeding evaluating Williams' conduct. This last act resulted in no findings of violations due to a lack of evidence.

Elliott further argues that Coach Arnold also wrongfully discriminated against her in connection with the Williams dispute. Elliott argues that in October 2009 Arnold was angry with Elliott because Elliott did not reach out to her first when the dispute with Williams began and instead contacted other DSU administrators. This anger, according to Elliott, was racially motivated. Arnold then punished Elliott with harsh treatment, including not playing her in games, and, in 2010, forcing the entire team to run only when Elliott made mistakes, excluding Elliott from team text messages, attempting to deny renewal of Elliott's scholarship, refusing to allow Elliott to travel with the team, repeatedly denouncing Elliott in front of the team, removing Elliott's name from the web-site, and, in 2011, forcing Elliott to undergo drug testing, and forcing her to play through painful shin splints.

To defeat DSU's motion for summary judgment of the racial discrimination claim, Elliott must provide admissible evidence tending to prove that either Christopher Hall or Coach Arnold treated her differently from similarly situated non-white students. *See id.* Elliott cannot do so as to either DSU official. The Court accepts as it must Elliott's statement that Hall admonished her to not "pull the race card" and also failed to give Elliott equal time in explaining the racial abuse she suffered at the hands of Williams. Elliott also established that Hall discouraged her from making further complaints about Williams' conduct, stating that further pursuit of complaints would be considered "throwing [Hall] under the bus and it would come back." Hall explained these comments as being made in the context of mutual charges of racism (which is uncontradicted), and as demonstrating the understanding between himself and the suitemates that he was skirting DSU regulations by not formally reporting the mutual charges of racism to judicial affairs, which is contradicted, and therefore not accepted for the purposes of this motion.

Elliott has not proved facts that give rise to the inference that Hall discriminated against her. The record shows that Hall was confronted with a contentious dispute between suitemates, with both sides hurling accusations of racism at each other. On the night of the September 21 incident, Hall gathered the parties in an attempt to mediate the dispute and resolve the tension. Housing disputes between freshman suitemates present a challenging problem for university officials. Hall's statements must be judged within the context of warring freshman roommates in an emotionally charged setting. Assuming that he showed favoritism to Williams, including not giving Elliott equal time to complain, this does not make out a claim that she was treated differently than similarly-situated non-whites in equivalent circumstances.[4]

---

[4] No evidence was offered to show that Hall would have said anything different to a non-white student who wanted to make a complaint against a roommate.

9

Further, Hall's failure to fully adhere to DSU's procedures in investigating and filing reports in connection with the suitemates' dispute does not give rise to an inference of discrimination.  Hall did file two separate reports in response to Elliott's complaints.  The first report was submitted September 10, 2009, and detailed the incident with Williams' drunken visitors.  Hall recommended disorderly conduct and disruptive behavior charges.  Hall designated this report as "informational" rather than an "infraction" report, meaning that it would not trigger proceedings against Williams.  Hall told Elliott that this was an "accidental" misclassification. On September 28, Hall filed the second report detailing his knowledge of the progression of the conflict between Williams and Elliott, apparently in response to a concerned phone call from the administration of DSU Judicial Affairs.  Williams was eventually charged with violating the DSU Student Code of Conduct, but was not found in actual violation due to a lack of evidence. Elliott complains that she was never allowed to provide evidence against Williams, but the record also shows that Elliott told DSU officials that she wanted to put her history with Williams behind her and no longer wished to be involved.  Assuming for the sake of argument that Hall could have handled Elliott's complaints differently and more favorably to Elliott, nothing in the record points to racial animus as the reason for the way the situation was actually handled. Hall's failure to initially charge Williams with racial abuse violations is explained by the fact that the initial racial threat was not uttered by Williams herself; it was made by one of her intoxicated guests.  Elliott further does not provide any evidence that Hall more scrupulously followed DSU regulations in response to complaints made by similarly situated non-whites.  For these reasons, Elliott has not established facts that Hall treated her differently due to her race.

Even if the totality of the above circumstances provided an inference of discrimination, Elliott does not establish any adverse action.  The Supreme Court has noted that it is important to

10

distinguish between significant and trivial harms when determining whether an adverse action

occurred. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Because this

case involves a Title VI claim brought by student against a university, rather than a claim by an

employee against an employer, Elliott must present facts showing that she was deprived of

access to educational benefits in a significant way.[5] Elliott fails to show how Hall deprived her

of such access. Elliott was not removed from the suite: Williams was. The fact that Williams

was never found guilty of violating the Student Code cannot possibly be said to have adversely

affected Elliott; Elliott does not argue that this had any impact on her life whatsoever. Such an

occurrence must therefore be regarded as trivial. Finally, although Elliott attempts to connect

Hall's mismanagement of the suitemate dispute with Arnold's harsh treatment, which, for the

most part, occurred eight months to a year and a half after the housing incident, Elliott

establishes no facts that Hall urged Arnold to punish Elliott or that Hall ever even communicated

with Arnold. For all these reasons, Elliott does not make a prima facie case of discrimination

based on the acts of Residential Director Christopher Hall.

     Elliott's discrimination argument does not end with Hall, however. Elliott argues that

Coach Arnold also racially discriminated against her. Elliott provides evidence that Arnold

singled Elliott out for especially harsh treatment, including forcing the entire team to run only

when Elliott made mistakes, excluding Elliott from team text messages, attempting to revoke

Elliott's scholarship, refusing to allow Elliott to travel with the team, refusing to play Elliott in

---

[5] Title VI protects against the denial of the opportunity to participate in or receive benefits from a federally funded
program due to race:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under any program or activity
> receiving Federal financial assistance.

42 U.S.C. § 2000d.

virtually every volleyball game, repeatedly denouncing Elliott in front of the team, forcing Elliott to undergo drug testing, removing Elliott's name from the web-site and team roster, and forcing Elliott to play through painful shin splints. Elliott, however, provides no facts suggesting that this mistreatment was rooted in race discrimination. The volleyball team, chiefly chosen by Arnold, was majority white and had only three non-white players. Elliott provides no evidence that black players were treated more favorably than white players in general. Arnold did give inconsistent reasons for attempting to deny renewal of the scholarships. Arnold initially proffered that budget cuts necessitated the decision. Arnold later admitted that budget cuts never took place and blamed the players' bad attitudes and lack of technical ability for the attempted non-renewal. This testimony, along with Elliott's declarations, shows Arnold's dissatisfaction with Elliott, and Arnold's actions may not be the best way to terminate an athlete's scholarship. It does not follow, however, that every time a college sports coach treats an athlete of a different race unfairly, material facts support an inference of discrimination. This is especially true in circumstances where the coach treated both the white and the black athlete the same, whether it was in the context of attempting to deny renewal of a scholarship or in the context of drug testing.[6] Without an indication that Arnold favored black players over Elliott specifically and the other white players generally, or some other suggestion that Arnold's animus toward Elliott was racially based, Elliott does not make a prima facie case of racial discrimination.[7] DSU is entitled to summary judgment on the racial discrimination claim.

## B. Racially Hostile Environment

---

[6] Coach Arnold had reason to do the drug testing. A recruit informed Coach Arnold that Elliott and other volleyball players were doing "something illegal." Whether the information Arnold got rises to the level of "reasonable suspicion," which the parties vigorously dispute, does not appear to be an issue that needs to be resolved.
[7] This does not preclude Elliott from showing that Arnold's mistreatment was motivated by a desire to punish Arnold for engaging in protected activity, i.e., in reaction to Elliott's complaints of racial harassment and discrimination.

DSU moves for summary judgment of Elliott's racially hostile environment claim. To maintain a Title VI claim for a racially hostile environment, Elliott must show (1) that racial harassment was so severe, pervasive, and objectively offensive that it deprived her of access to educational opportunity and (2) that the school acted with deliberate indifference to the harassment. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648-52 (1999). The harassment must rise above the level of "simple acts of teasing and name-calling among school children . . . even when those comments target differences in [race]." *Id.* at 652.

This is judged by a "totality of the circumstances" analysis, including the frequency and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the student's educational opportunities. *Hendrichsen v. Ball State Univ.*, 107 F. App'x. 680, 684 (7th Cir. 2004).[8]

Elliott argues that Kristen Williams created a racially hostile environment and that Hall both compounded and consciously failed to remedy the abusive atmosphere. There is evidence that Elliott suffered racial insults during the weeks she spent as a suitemate with Williams. Williams' intoxicated friend threatened Elliott, "If I ever see these white bitches around campus, they're done. These white bitches don't know who they are messing with," to which Williams added, "These white girls know nothing." Further, Williams herself threatened Elliott and another white suitemate in response to requests that Williams keep her music down, saying, "Fuck your scholarships. I'm gonna make sure you get kicked out for this. Fuck you white girls and if I see you around campus, you're done! Stupid white girls, you stupid bitches are done. I'm going to kick your white asses." These are the only two incidents of overt racial abuse

---

[8] Courts routinely use Title IX precedent to determine the analysis in an analogous Title VI action. *See, e.g., Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521-22 (3d Cir. 2011) (using Title IX precedent as basis for affirming district court's decision to grant summary judgment on Title VI racially hostile environment claim).

suffered by Elliott. To be sure, Elliott was required to endure an uncomfortable living situation for a period of at least twenty-two days in September 2009. This period of time, however, was relatively short, and did not involve physical violence or imminent threats of physical violence. Elliott has not established severe, pervasive, and objectively offensive harassment to survive summary judgment on her racially hostile environment claim. *See Hendrichsen*, 107 F. App'x at 684.

Further, even if these acts were severe enough to establish a hostile environment claim, Elliott does not establish facts suggesting that DSU acted with "deliberate indifference" in response to the racial harassment. A school may be held liable for a Title VI claim of student-on-student racial discrimination when the school's response is "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. The fact that DSU did not immediately separate Williams and Elliott is unsurprising, as squabbles between suitemates are relatively common in freshman dorms, and DSU has a legitimate interest in trying to have roommates overcome their differences. Learning to get along with others is part of the growing up process. Hall did warn Elliott against pursuing further complaints, but Elliott complained anyway and the DSU administration was responsive; Williams was removed from the suite and judicial proceedings were instituted against her. This response was not "clearly unreasonable in light of the circumstances" and thus Elliott cannot establish that DSU acted with "deliberate indifference."

Elliott also argues that Coach Arnold's mistreatment rises to the level of a racially hostile environment. As discussed above, Elliott provided no evidence that Arnold racially abused her or any of the white volleyball players, or that Arnold's harsh treatment was racially motivated. While Elliott may have a claim of retaliation against Arnold, she provides no facts suggesting a

14

racial element. For all these reasons, DSU is entitled to summary judgment on Elliott's racially

hostile environment claim.

## C. Retaliation

DSU also moves for summary judgment of Elliott's retaliation claim. To avoid summary

judgment, Elliott must show that "(1) she engaged in protected activity; (2) [DSU] subjected

[her] to an adverse action after or contemporaneously with the protected activity; and (3) a causal

link exists between the protected activity and the adverse action." *Cabrea-Diaz v. Penn Kidder

Campus Jim Thorpe Sch. Dist.*, 2010 WL 5818289, * 10 (M.D. Pa. 2010).

Elliott argues that both Residential Director Hall and Coach Arnold retaliated against her

for making complaints of racial discrimination. Although Elliott argues that these two officials

retaliated against her in concert, Elliott does not establish facts suggesting in any way that the

two were actually working together. The Court will thus analyze Hall and Arnold's conduct

independently from one another. The Court first examines the actions of Hall. Hall did threaten

to retaliate against Elliott if she continued complaining about Williams' racial abuse. Such

complaints are clearly protected activity. Hall's threat, however, never materialized into

anything resembling an adverse action. Williams was required to vacate the suite and Elliott

stayed. Further, Hall's reluctance to pursue judicial proceedings against Williams cannot be

construed as an adverse action against Elliott, as the outcome of those proceedings did not affect

Elliott in any way. Elliott offers no further facts suggesting that Hall adversely affected her life

whatsoever subsequent to these events. Therefore, Elliott has not established that Hall caused

her to suffer an adverse action.

The Court next turns to the conduct of Coach Arnold. Elliott has established facts supporting a retaliation claim based on Arnold's actions. Although Elliott does not link Arnold's harsh treatment with the complaints Elliott made to Hall,[9] there is evidence that Arnold ratcheted up the pressure on Elliott after hearing that Elliott had directly accused Arnold of racism. This evidence comes from both Elliott and from Arnold's own statements. Elliott's mother had contacted Derek Carter, the Director of Athletics at DSU, and complained that Arnold's attempt to deny renewal of Elliott's scholarship was racially motivated.[10] In a direct response to this protected activity, Arnold stood in front of the volleyball team and verbally denounced Elliott, declaring that Elliott was only on the team because Elliott accused Arnold of being a racist and because Elliott was going to sue the school. Elliott made factually specific declarations suggesting that Arnold's treatment harshened subsequent to Arnold's denouncement. These events provide both the protected activity and the "causal link" necessary for establishing a retaliation claim.

Elliott must also establish that a factual issue exists as to whether Arnold's treatment constituted an adverse action. Elliott proffers a theory of constructive discharge. To establish constructive discharge, Elliott must show that the retaliation surpassed a "threshold of 'intolerable conditions'" making continued participation in an educational program or activity

---

[9] Elliott argues that Coach Arnold "turned cold" soon after Elliott's housing complaints, but Elliott provides no credible facts or theory hinting why Coach Arnold would retaliate against a freshly recruited volleyball player based on that player triggering university involvement in a suitemate dispute. Indeed, the evidence of record indicates Coach Arnold was very supportive of her player in connection with the housing dispute as evidenced by her October 1 e-mail. *See* n. 2 *supra*. There is no "causal link" between those specific complaints and Coach Arnold's treatment of Elliott in the fall of 2009.

[10] DSU argues that because this specific complaint came from Elliott's mother, rather than Elliott herself, it should not be considered protected activity. The Court finds this argument unavailing, as the record shows that Elliott was the source of the complaints and that Coach Arnold attributed them to Elliott. The fact that Elliott's mother acted as the conduit for Elliott's complaints should not defeat Elliott's retaliation claim any more so than if the complaint had been communicated by her attorney or someone else acting on her behalf.

16

impossible.[11] *See Duffy v. Paper Magic Group., Inc.*, 265 F.3d 163, 169 (3d Cir. 2001)

(employment context). Only acts committed contemporaneously or after the protected activity

can substantiate the constructive discharge theory. *Cabrera-Diaz*, 2010 WL 5818289, at * 10.

Thus, Arnold's failed attempt to terminate Elliott's scholarship on April 9, 2010, is not a part of

the constructive discharge analysis. It was resolved by April 19, 2010. Elliott's protected

activity occurred on April 22, 2010, and the first reaction in response was on April 24, 2010.

Elliott testified to a multitude of acts by Arnold after April 24, 2010, that, in combination, could

rise to "a threshold of intolerable conditions" that forced Elliott to quit the team. Arnold's

announcement that Elliott was only on the team because she accused Arnold of being a racist and

was going to sue the school is a fairly blatant attempt to shame Elliott and alienate her from the

rest of the team. Arnold also excluded Elliott from team text messages and removed (or caused

to be removed) Elliott's profile from the team web-site. Elliott was not allowed to travel with the

team and was incorrectly told it was because of travel expenses. When Arnold was eventually

forced to allow Elliott to travel, Arnold announced to the team that everyone would receive less

travel money as a result. Elliott was uniquely forced to play through painful shin splints, as other

players' requests to rest due to injuries were routinely granted without medical documentation.

Elliott further was only allowed to play in a few minutes in a single game of the thirty-nine game

season. Viewed in the light most favorable to Elliott, Arnold went to considerable lengths to

make Elliott's life as a volleyball player miserable. It is hard to imagine that a student-athlete

would be expected to endure such openly hostile treatment by her own coach. The Court cannot

say that the conditions were not objectively intolerable. Since the conditions appear to be

---

[11] It is not necessary for Elliott to show that the retaliatory acts made attending classes at DSU intolerable. Because Title VI outlaws discriminatory acts that deny access to "any educational program or activity," it is only necessary for Elliott to show that Arnold's behavior made participating on the volleyball team intolerable. *See* 42 U.S.C. § 2000d.

17

causally connected to her allegations of Arnold's racism, the Court declines to grant DSU

summary judgment on Elliott's retaliation claim.

An appropriate order will issue.